**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, ACTING BY AND THROUGH DELAWARE COUNTY DISTRICT ATTORNEY JACK STOLLSTEIMER; DELAWARE COUNTY; and PRIMOS-SECANE-WESTBROOK PARK FIRE COMPANY #5 OF UPPER DARBY PENNSYLVANIA, INC., | |
| Plaintiffs, | |
| v. | Civil Action No. 21-2743 |
| 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.); E. I. DUPONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; DUPONT DE NEMOURS, INC.; CORTEVA, INC.; CHEMGUARD, INC.; TYCO FIRE PRODUCTS LP (successor-in-interest to The Ansul Company); KIDDE-FENWAL, INC.; KIDDE PLC, INC.; CHUBB FIRE, LTD.; UTC FIRE & SECURITY AMERICAS CORPORATION, INC.; CARRIER GLOBAL CORPORATION; RAYTHEON TECHNOLOGIES CORPORATION (f/k/a United Technologies Corporation); NATIONAL FOAM, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; ARKEMA, INC.; BASF CORPORATION; CHEMDESIGN PRODUCTS, INC.; CLARIANT CORPORATION; CHEMICALS INCORPORATED; NATION FORD CHEMICAL COMPANY; AGC INC. (f/k/a Asahi Glass Co., Ltd.); AGC CHEMICALS AMERICAS INC.; DEEPWATER CHEMICALS, INC.; DYNAX CORPORATION; ARCHROMA MANAGEMENT, LLC; ARCHROMA U.S., INC.; AND JOHN DOE DEFENDANTS 1-49, | **NOTICE OF REMOVAL**<br><br>**JURY TRIAL DEMANDED** |
| Defendants. | |

Defendants Tyco Fire Products LP and Chemguard, Inc. ("Tyco and Chemguard"), by and through undersigned counsel, hereby give notice of the removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, from the Court of Common Pleas of Delaware County, Pennsylvania, to the United States District Court for the Eastern District of Pennsylvania. As

1

grounds for removal, Tyco and Chemguard allege as follows on personal knowledge as to their own conduct and status and on information and belief as to all other matters:

## PRELIMINARY STATEMENT

1.　　Plaintiffs the Commonwealth of Pennsylvania, acting by and through Delaware County District Attorney Jack Stollsteimer, Delaware County, and Primos-Secane-Westbrook Park Fire Company #5 of Upper Darby Pennsylvania, Inc. seek to hold Tyco and Chemguard and certain other Defendants liable based on their alleged conduct in designing, manufacturing, and/or selling aqueous film-forming foams ("AFFF") at or near their property, which allegedly contaminated their properties.

2.　　A "Part 139" civilian airport—the Philadelphia International Airport[1] in Philadelphia, Pennsylvania ("the Airport")—is a plausible source of the AFFF that has allegedly caused Plaintiffs' injuries.  Part 139 airports are required by law to stock and use AFFF manufactured by a select group of suppliers (including Tyco and Chemguard) whose products appear on the Department of Defense ("DoD") Qualified Products List for sale to the United States military and others in accordance with the military's rigorous specifications ("MilSpec AFFF").  Under the federal "government contractor" defense recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), Tyco and Chemguard are immune to tort liability for their design and manufacture of MilSpec AFFF and their provision of warnings for the product.  Under the federal officer removal statute, 28 U.S.C. § 1442, Tyco and Chemguard are entitled to remove this action in order to have their federal defense adjudicated in a federal forum.  *See Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 810–15 (3d Cir. 2016) (alterations in original).  Such removal "fulfills the federal officer

---

[1] *See* FAA Part 139 Airport Certification Status List (last updated Apr. 27, 2021), available at https://www.faa.gov/airports/airport_safety/part139_cert/.

removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008).

## BACKGROUND

3.      This action was filed on May 17, 2021, in the Court of Common Pleas of Delaware County, Pennsylvania, bearing Docket No. CV-2021-004523 (Ex. A, Complaint).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 118(a) and 1441(a) because the Court of Common Pleas of Delaware County, Pennsylvania, is located within the Eastern District of Pennsylvania.

4.      Tyco and Chemguard accepted service of the Complaint on June 1, 2021.  Tyco and Chemguard are aware of no other proceedings before the Court of Common Pleas of Delaware County, Pennsylvania, in this matter.

5.      Tyco and Chemguard are not required to notify or obtain the consent of any other Defendant in this action in order to remove Plaintiffs' action as a whole under § 1442(a)(1).  *See, e.g.*, *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Linden v. Chase Manhattan Corp.*, No. 99 Civ. 3970(LLS), 1999 WL 518836, at *1 (S.D.N.Y. July 21, 1999); *Torres v. CBS News*, 854 F. Supp. 245, 246 n.2 (S.D.N.Y. 1994).

6.      Plaintiffs generally allege that Defendants, including Tyco and Chemguard, have designed, manufactured, marketed, distributed, and/or sold AFFF products and/or fluorinated surfactants used therein, which contain PFAS, including PFOS, PFOA, and/or their precursors. (Ex. A, Compl. ¶¶ 9–13, 37).  Plaintiffs allege that these AFFF products were released, used, stored, and/or disposed of at or near their properties.  (*Id.* ¶¶ 14, 59, 72, 88).  They further allege that Defendants' products resulted in PFOA, PFOS, and/or their precursors migrating into

groundwater and the ensuing contamination of the surface water, soil, sediment, and groundwater of their properties.  (*Id.* ¶¶ 14–18, 43–45, 59–60, 62–64).

7.      Plaintiffs assert claims for strict liability for a design defect and/or defective product (*id.* ¶¶ 65–82), strict liability for failure to warn (*id.* ¶¶ 83–94), nuisance (*id.* ¶¶ 95–103), trespass (*id.* ¶¶ 104–12), negligence (*id.* ¶¶ 113–21), civil conspiracy (*id.* ¶¶ 122–27), fraudulent transfer (*id.* ¶¶ 128–38), and violations to Pennsylvania's Unfair Trade Practices and Consumer Protection Law (*id.* ¶¶ 139–59).

8.      Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for Plaintiffs and a copy is being filed with the Clerk of the Court of Common Pleas of Delaware County, Pennsylvania.

9.      By filing a Notice of Removal in this matter, Tyco and Chemguard do not waive the rights of any Defendant to object to service of process, the sufficiency of process, jurisdiction over the person, or venue; and Tyco and Chemguard specifically reserve the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

10.      Tyco and Chemguard reserve the right to amend or supplement this Notice of Removal.

## REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442

11.      Removal here is proper under the federal officer removal statutes, 28 U.S.C. § 1442(a)(1), which provides for removal of an action relating to a defendant's acts undertaken at the direction of a federal officer.  Removal is appropriate under this provision where the removing defendant establishes that: (a) it is a "person" within the meaning of the statute; (b) it acted under federal authority; (c) plaintiff's claims are "for[] or relating to" the defendant's actions taken pursuant to a federal officer's directions; and (d) it can assert a "colorable" federal defense.  *Papp*,

842 F.3d at 812; *cf. Mesa v. California*, 489 U.S. 121, 124–25, 129–31, 133–35 (1989); *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Isaacson*, 517 F.3d at 135; *Durham*, 445 F.3d at 1251.

12.     Removal rights under the federal officer removal statute are much broader than under the general removal statute, 28 U.S.C. § 1441.  Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999).  This is because § 1442 protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990(BSJ), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011) (citation omitted).  This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969); *see Durham*, 445 F.3d at 1252.  To the contrary, § 1442 as a whole must be "liberally construe[d]" in favor of removal.  *Papp*, 842 F.3d at 812 (alterations in original) (internal quotation marks omitted).

13.     All requirements for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that the plaintiff's injuries are caused at least in part by MilSpec AFFF. *See, e.g.*, *Nessel v. Chemguard, Inc.*, No. 1:20-cv-1080, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021) (denying motion to remand in AFFF case against Tyco and Chemguard and other manufacturers and holding that, notwithstanding plaintiffs' assertion "that they do not seek resolution of any claims related to MilSpec AFFF[,] . . . . Plaintiffs cannot decide what defense Defendants might present"); *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in a lawsuit against Tyco and Chemguard and other AFFF manufacturers).  The court

overseeing the *In re Aqueous Film-Forming Foams Products Liability Litigation* multi-district litigation has also found on multiple occasions that removal under § 1442 is proper where the notice of removal alleges that plaintiffs' injuries are caused, at least in part, by MilSpec AFFF. *See* Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 103 (D.S.C. May 24, 2019) ("MDL Order 1"), at 3–6; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 320 (D.S.C. Sept. 27, 2019) ("MDL Order 2"), at 3–5; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 325 (D.S.C. Oct. 1, 2019) ("MDL Order 3"), at 3–6.  Given its experience with the claims and defenses in AFFF litigation, the MDL Court's holdings clearly demonstrate that this case, too, has been properly removed to federal court.[2]

## A.     MilSpec AFFF

14.     Since the 1960s, the United States military has used MilSpec AFFF on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property.  Indeed, the United States Naval Research Laboratory developed AFFF in response to catastrophic fires aboard the aircraft carriers *USS Forrestal* in 1967 and *USS Enterprise* in 1969.[3]  Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[4]

---

[2] Following removal, Tyco and Chemguard intend to designate this action for transfer to the MDL.

[3] *See* Press Release 71-09r, U.S. Naval Research Lab., Navy Researchers Apply Science to Fire Fighting (Oct. 23, 2009), https://tinyurl.com/y2jq4q4w.

[4] U.S. Navy, NRL/MR/1001-06-8951, The U.S. Naval Research Laboratory (1923–2005): Fulfilling the Roosevelts' Vision for American Naval Power 37 (2006) ("Fulfilling the Roosevelts' Vision"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

15.     The manufacture and sale of MilSpec AFFF is governed by rigorous military specifications created and administered by Naval Sea Systems Command.  The applicable specification, Mil-F-24385, was first promulgated in 1969, and has been revised a number of times since then.[5]  All MilSpec AFFF products must be qualified for listing on the applicable Qualified Products List prior to military procurement.  Prior to such listing, a manufacturer's products are examined, tested, and approved to be in conformance with specification requirements.[6]  The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements.  After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[7]  Naval Sea Systems Command reserves the right to perform any of the quality assurance inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements.

16.     From its inception until very recently, the MilSpec included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants."  All fluorocarbon surfactants are PFAS, and that category includes PFOA, PFOS, and their chemical precursors—the very compounds at issue in the Complaint here.  This requirement has been in force for virtually the entire time period at issue in the Complaint.  In 2019 the MilSpec removed the modifier "fluorocarbon" from "surfactants," but it expressly states that "the DoD intends to acquire and use

---

[5] The 1969 MilSpec and all its revisions and amendments through April 2020 are available at https://tinyurl.com/yxwotjpg.

[6] Dep't of Defense SD-6, Provisions Governing Qualification 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

[7] *Id.*

AFFF with the lowest demonstrable concentrations of . . . PFOS and PFOA" "[i]n the short term." PFOA or PFOS are unavoidably present at some concentrations in fluorocarbon surfactants, and the current MilSpec expressly contemplates that AFFF formulations will contain PFOA and PFOS (subject to recently imposed limits).

17.     So-called "Part 139" airports are those serving scheduled passenger flights by nine passenger (or larger) aircraft or unscheduled passenger flights by 31 passenger (or larger) aircraft. *See* 14 C.F.R. § 139.1 (2019).  The federal government requires Part 139 airports to use MilSpec AFFF.  On July 8, 2004, the FAA issued Advisory Circular 150/5210-6D, which stated that "AFFF agents [used by Part 139 airports] must meet the requirements of Mil-F-24385F."[8]  Although the preamble indicated that the circular was for guidance only, on February 8, 2006, the FAA issued a CertAlert clarifying that the MilSpec AFFF requirement was, in fact, mandatory and that "[a]ny AFFF purchased after July 1, 2006 by an airport operator certified under Part 139 must meet [Mil-F-24385F]."[9]  The FAA explained:

> There are several reasons for this requirement.  First of all, AFFF has to be compatible when mixed.  AFFF manufactured by different manufacturers, although meeting the UL 162 standard, may not be compatible.  AFFF meeting the Military Specification will always be compatible with other Military Specification AFFF no matter the manufacturer.  Second, AFFF meeting the military specification requires less agent than AFFF meeting UL 162 to extinguish the same size fire.  Finally, the requirement to use Mil Spec is in concert with the National Fire Protection Association National Fire Code 403, paragraph 5.1.2.1.[10]

18.     On September 1, 2016, the FAA issued a superseding CertAlert, which reiterated that "Airport operators must ensure any AFFF purchased after July 1, 2006, meets Mil-Spec

---

[8] *See* Advisory Circular 150/5210-6D at 4, Chapter 6, https://tinyurl.com/yxpk87ky.

[9] *See* DOT/FAA/TC-14/22, Impact of Alternative Fuels Present in Airports on Aircraft Rescue and Firefighting Response at 25-26 (Aug. 2014), https://tinyurl.com/rt35dgp.

[10] *Id.*

standards."[11]   Thus, from July 1, 2006 to present, airport operators holding an FAA Airport Operating Certificate have been required to purchase MilSpec AFFF for use.

19.    Plaintiffs allege that the purported contamination of their properties—the Delaware County Emergency Services Training Center ("DelCo Training Center") and Primos Station—is "a result of the use of Defendants' Fluorosurfactant Products for their intended purpose."  (Ex. A, Compl. ¶ 15; *see also id.*  ¶¶ 5–8, 14).  Plaintiffs add that AFFF is generally "used to control and extinguish Class B fuel fires and is used at sites such as military bases, airport, petroleum refineries, and fire training centers."  (*Id.* ¶ 12).

20.    The Airport—a federally-regulated Part 139 airport[12] that is required to stock and use MilSpec AFFF—is a plausible source of the alleged PFAS contamination that gives rise to Plaintiffs' claims.  MilSpec AFFF has been used and released into the environment at the Airport since at least 2006.

21.    One of the allegedly contaminated sites at issue in this case—DelCo Training Center—is located in close proximity to the Airport; they are only separated by Darby Creek. Plaintiff Primos-Secane-Westbrook Park Fire Company #5 of Upper Darby Pennsylvania, Inc. is located approximately six miles from the Airport.

**B.    All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied**

> *1.    The "Person" Requirement Is Satisfied*

22.    The first requirement for removal under the federal officer removal statute is satisfied here because Tyco and Chemguard (corporations) are "persons" under the statute.  For

---

[11] Federal Aviation Administration, Cert Alert No. 16-05: Update on Mil-Spec Aqueous Film Forming Foam (AFFF) at 2 (Sept. 1, 2016), https://tinyurl.com/ya5pvbkh.

[12] *See* FAA Part 139 Airport Certification Status List (last updated Apr. 27, 2021), available at https://www.faa.gov/airports/airport_safety/part139_cert/.

purposes of § 1442(a)(1), the term "person" includes "corporations, companies, associations, firms, [and] partnerships." *Papp*, 842 F.3d at 812 (quoting 1 U.S.C. § 1); *accord Bennett*, 607 F.3d at 1085; *Isaacson*, 517 F.3d at 135–36.

### 2.    *The "Acting Under" Requirement Is Satisfied*

23.    The second requirement ("acting under" a federal officer) is satisfied when an entity assists or helps carry out, the duties or tasks of a federal officer. *Papp*, 842 F.3d at 812. "The words 'acting under' are to be interpreted broadly . . . ." *Isaacson*, 517 F.3d at 136 (citation omitted). Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813.

24.    The requirement of "acting under" federal office is met here because Plaintiffs' claims, at least in part, challenge Tyco and Chemguard's alleged conduct in providing vital products "that, in the absence of Defendants, the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137. MilSpec AFFF is a mission-critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018 WL 4781145, at *9 (describing MilSpec AFFF as a "mission-critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members (internal quotation marks omitted)); *cf. Isaacson*, 517 F.3d at 137. The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations."[13]    Accordingly, the military has long depended upon outside contractors like Tyco and Chemguard to develop and supply AFFF. *See Chemguard*, 2021

---

[13] Fulfilling the Roosevelts' Vision, *supra* n.3, at 37.

WL 744683, at *3 (holding that Tyco and Chemguard and other AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *Ayo*, 2018 WL 4781145, at *8–9 (same); *see also* MDL Order 1, at 3–6 (finding that the "acting under" requirement was satisfied because defendant demonstrated that it was manufacturing AFFF under the guidance of the U.S. military); MDL Order 2, at 3–5 (same for AFFF used at Part 139 airport); MDL Order 3, at 3–6 (same). If Tyco and Chemguard and other manufacturers did not provide MilSpec AFFF for use at military bases and Part 139 airports, the government would have to manufacture and supply the product itself.

25.     In designing, manufacturing and supplying the MilSpec AFFF at issue, Tyco and Chemguard acted under the direction and control of one or more federal officers. Specifically, Tyco and Chemguard acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. Further, the AFFF products in question were subject to various tests by the United States Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the DoD.[14]

### 3.     The "For or Relating to" Requirement Is Satisfied

26.     The third requirement, that plaintiff's claims be "for or relating to" defendant's actions taken "under color of federal office," requires only that there be some connection between the claims and defendant's actions under color of federal office. *Papp*, 842 F.3d at 812–13. This requirement, sometimes termed the "causation" requirement, erects a low hurdle. *Isaacson*, 517 F.3d at 137.[15] The requirement is satisfied if the defendant establishes that an act that allegedly

---

[14] *See* Dep't of Defense, SD-6, *supra* n.5, at 1.

[15] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL

caused or contributed to the plaintiff's injury occurred while the defendant was performing its official duties. *Isaacson*, 517 F.3d at 137–38.

27.     Here, the Plaintiffs' claims arise at least in part from Tyco and Chemguard's production and sale of AFFF manufactured to military specifications for use at Part 139 airports. Plaintiffs allege that the use of PFAS in AFFF is the source of its injuries.  Tyco and Chemguard contend that the use of such chemicals in MilSpec AFFF was required by military specifications. The conflict is apparent:  MilSpec AFFF was developed by Tyco, Chemguard, and other manufacturers to meet specifications established by the DoD.  Military installations and Part 139 airports are required to employ MilSpec AFFF.  The design choices Plaintiffs are attempting to impose via state tort law would create a conflict in which Tyco and Chemguard could not comply with both the MilSpec and the purported state-prescribed duty of care.  *See Boyle*, 487 U.S. at 509; *see also Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a 'casual connection' between the use of PFCs in AFFF and the design and manufacture of AFFF for the government."); MDL Order 1, at 5–6 ("Here, [Plaintiff]'s claims arise out of use of AFFF products that it claims Tyco manufactured and sold, and for which the U.S. military imposes MilSpec standards.  The Court . . . finds that the causation element of federal officer removal is satisfied here."); MDL Order 2, at 5 (finding the causation element of federal officer removal satisfied where Tyco and Chemguard's AFFF products, "for which the military imposes MilSpec standards," were used at several Part 139 airports); MDL Order 3, at 5–6 (same as to MilSpec AFFF used at a single airport).

28.     Here, Plaintiffs' purported injuries arise at least in part from MilSpec AFFF.  The causal connection between Plaintiffs' alleged injuries and Tyco and Chemguard's actions under color of federal office is clear.  It is irrelevant that the Plaintiffs do not expressly contend that it

---

5109532, at *5.

has been injured by MilSpec AFFF. Courts "credit Defendants' theory of the case when determining whether [the] causal connection exists." *Isaacson*, 517 F.3d at 137; *see also Chemguard*, 2021 WL 744683, at *3 (noting that "Plaintiffs cannot decide what defense Defendants might present").

4.    *The "Colorable Federal Defense" Requirement Is Satisfied*

29.    The fourth requirement ("colorable federal defense") is satisfied by Tyco and Chemguard's assertion of the government contractor defense.

30.    At the removal stage, a defendant need only show that its government contractor defense is colorable; that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original) (citation omitted). "A defendant 'need not win his case before he can have it removed.'" *Id.* (quoting *Willingham*, 395 U.S. at 407); *see also Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court." (citation omitted)). At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116.[16] Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of

---

[16] *See also Kraus v. Alcatel-Lucent*, No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense." (internal citation omitted)).

the facts to a federal, not a state, court.'"  *Cuomo*, 771 F.3d at 116 (alteration in original) (citation omitted).

31.     Under the government contractor defense, the defendant is not liable for the design, manufacture, or warnings of equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."  *Boyle*, 487 U.S. at 512.

32.     Tyco and Chemguard have satisfied these elements for purposes of removal.  As discussed above, Naval Sea Systems Command approved reasonably precise specifications, governing MilSpec AFFF formulation, performance, testing, storage, inspection, packaging, and labeling.  Tyco and Chemguard's products appeared on the DoD Qualified Products List, which could have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec.  *See Ayo*, 2018 WL 4781145, at *13 ("[T]here is colorable evidence that Manufacturing Defendants' Mil-Spec AFFF is not a stock product and that the government approved reasonably precise specifications requiring them to use PFCs, including PFOS and PFOA, in their products."); *see also id.* ("There is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications."); MDL Order 1, at 5 (finding defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications"); MDL Order 2, at 4 (same, as to Tyco and Chemguard); MDL Order 3, at 5 (same); *see also Chemguard*, 2021 WL 744683, at *4.

33.     Moreover, the government was sufficiently informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and

procuring MilSpec AFFF.  The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand.  Indeed, it is clear that the United States has long understood that AFFF contains PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or human health issues.[17]  For example, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from fire fighting exercises are considered to have adverse effects environmentally."[18]  By no later than 2001, DoD was aware of data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent."  In 2002, the United States Environmental Protection Agency issued a draft hazard assessment for PFOA, which reviewed in detail, among other data, human epidemiological studies and animal toxicology studies pertaining to alleged associations between PFOA and cancer.  More recently, in a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA regarding PFOS and PFOA.  Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[19]  Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants," and

---

[17] *See, e.g.*, EPA, *Revised Draft Hazard Assessment of Perfluorooctanoic Acid and Its Salts* 1–6 (Nov. 4, 2002) (excerpt).

[18] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), https://apps.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

[19] Dep't of Defense, *Aqueous Film Forming Foam Report to Congress* 1–2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/wshcww4.

recognizes that PFAS, including PFOS and PFOA, will be present (subject to recently imposed limits for PFOS and PFOA) in AFFF formulations.[20]  *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design."); MDL Order 1, at 5 ("As to whether [defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, [defendant] points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in drinking water . . . .").

34.     At minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks.  *See Twinam v. Dow Chem. Co.* (*In re "Agent Orange" Prod. Liab. Litig.*), 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht*, 2011 WL 5109532, at *5 ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'" (citation omitted)).  Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies.  *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89–90; *see also Ayo*, 2018 WL 4781145, at *13.

---

[20]     *See* MIL-PRF-24385F(SH), Amendment 4, § 6.6 & Tables I, III (2020), https://quicksearch.dla.mil/qsDocDetails.aspx?ident_number=17270; *see also* David Vergun, *DOD Officials Discuss Fire-Fighting Foam Replacement, Remediation Efforts* (Sept. 16, 2020), https://tinyurl.com/ty5ku8hp.

35.     Tyco and Chemguard's use of PFAS in MilSpec AFFF was required by military specifications.  By seeking to impose tort liability on Tyco and/or Chemguard for alleged injuries to Plaintiffs that were caused in whole or in part by Tyco and Chemguard's compliance with military specifications, Plaintiffs are attempting to use state tort law to attack design choices dictated by the military.  The government contractor defense precludes such an attack.  *See Boyle*, 487 U.S. at 509.

WHEREFORE, Tyco and Chemguard hereby remove this action from the Court of Common Pleas of Delaware County, Pennsylvania, to this Court.

RESPECTFULLY SUBMITTED this 18th day of June, 2021.

ARCHER & GREINER,
A professional Corporation
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103

By:   */s/ Kerri E. Chewning*
KERRI E. CHEWNING
kchewning@archerlaw.com

    *Counsel for Tyco Fire Products LP and Chemguard, Inc.*

221427799v1

# EXHIBIT A

# Supreme Court of Pennsylvania

## Court of Common Pleas
## Civil Cover Sheet

_____Delaware_____ **County**

| For Prothonotary Use Only: |
| --- |
| Docket No: |
| CV-2021-004623 |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**

- [x] Complaint
- [ ] Writ of Summons
- [ ] Petition
- [ ] Transfer from Another Jurisdiction
- [ ] Declaration of Taking

| Lead Plaintiff's Name: | Lead Defendant's Name: |
| --- | --- |
| Comm of Pa acting through DelCo DA Jack Stollsteimer | 3M Company |

**Are money damages requested?** [x] Yes [ ] No

Dollar Amount Requested: (check one)
- [ ] within arbitration limits
- [x] outside arbitration limits

**Is this a *Class Action Suit*?** [ ] Yes [x] No

**Is this an *MDJ Appeal*?** [ ] Yes [x] No

Name of Plaintiff/Appellant's Attorney: Jerry R. DeSiderato, Esquire

[ ] **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**SECTION B**

**TORT** (*do not include Mass Tort*)
- [ ] Intentional
- [ ] Malicious Prosecution
- [ ] Motor Vehicle
- [ ] Nuisance
- [ ] Premises Liability
- [ ] Product Liability (*does not include mass tort*)
- [ ] Slander/Libel/ Defamation
- [x] Other:
  Unfair Trade Practices and
  Consumer Protection Law

**MASS TORT**
- [ ] Asbestos
- [ ] Tobacco
- [ ] Toxic Tort - DES
- [ ] Toxic Tort - Implant
- [ ] Toxic Waste
- [ ] Other:

**PROFESSIONAL LIABLITY**
- [ ] Dental
- [ ] Legal
- [ ] Medical
- [ ] Other Professional:

**CONTRACT** (*do not include Judgments*)
- [ ] Buyer Plaintiff
- [ ] Debt Collection: Credit Card
- [ ] Debt Collection: Other
- [ ] Employment Dispute: Discrimination
- [ ] Employment Dispute: Other
- [ ] Other:

**REAL PROPERTY**
- [ ] Ejectment
- [ ] Eminent Domain/Condemnation
- [ ] Ground Rent
- [ ] Landlord/Tenant Dispute
- [ ] Mortgage Foreclosure: Residential
- [ ] Mortgage Foreclosure: Commercial
- [ ] Partition
- [ ] Quiet Title
- [ ] Other:

**CIVIL APPEALS**
Administrative Agencies
- [ ] Board of Assessment
- [ ] Board of Elections
- [ ] Dept. of Transportation
- [ ] Statutory Appeal: Other
- [ ] Zoning Board
- [ ] Other:

**MISCELLANEOUS**
- [ ] Common Law/Statutory Arbitration
- [ ] Declaratory Judgment
- [ ] Mandamus
- [ ] Non-Domestic Relations Restraining Order
- [ ] Quo Warranto
- [ ] Replevin
- [ ] Other:

*Updated 1/1/2011*

# NOTICE

**Pennsylvania Rule of Civil Procedure 205.5. (Cover Sheet) provides, in part:**

**Rule 205.5.    Cover Sheet**

(a)(1)   This rule shall apply to all actions governed by the rules of civil procedure except the following:

      (i)     actions pursuant to the Protection from Abuse Act, Rules 1901 et seq.

      (ii)    actions for support, Rules 1910.1 et seq.

      (iii)   actions for custody, partial custody and visitation of minor children, Rules 1915.1 et seq.

      (iv)   actions for divorce or annulment of marriage, Rules 1920.1 et seq.

      (v)    actions in domestic relations generally, including paternity actions, Rules 1930.1 et seq.

      (vi)   voluntary mediation in custody actions, Rules 1940.1 et seq.

(2)     At the commencement of any action, the party initiating the action shall complete the cover sheet set forth in subdivision (e) and file it with the prothonotary.

(b)     The prothonotary shall not accept a filing commencing an action without a completed cover sheet.

(c)     The prothonotary shall assist a party appearing pro se in the completion of the form.

(d)     A judicial district which has implemented an electronic filing system pursuant to Rule 205.4 and has promulgated those procedures pursuant to Rule 239.9 shall be exempt from the provisions of this rule.

(e)     The Court Administrator of Pennsylvania, in conjunction with the Civil Procedural Rules Committee, shall design and publish the cover sheet.  The latest version of the form shall be published on the website of the Administrative Office of Pennsylvania Courts at www.pacourts.us.

**IN THE COURT OF COMMON PLEAS**
**OF DELAWARE COUNTY, PENNSYLVANIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, ACTING BY AND THROUGH DELAWARE COUNTY DISTRICT ATTORNEY JACK STOLLSTEIMER; DELAWARE COUNTY; and PRIMOS-SECANE-WESTBROOK PARK FIRE COMPANY #5 OF UPPER DARBY PENNSYLVANIA, INC., | CIVIL ACTION No.: |
| Plaintiffs, | **COMPLAINT IN CIVIL ACTION** |
| v. | |
| 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.); E. I. DUPONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; DUPONT DE NEMOURS, INC.; CORTEVA, INC.; CHEMGUARD, INC.; TYCO FIRE PRODUCTS LP (successor-in-interest to The Ansul Company); KIDDE-FENWAL, INC.; KIDDE PLC, INC.; CHUBB FIRE, LTD.; UTC FIRE & SECURITY AMERICAS CORPORATION, INC.; CARRIER GLOBAL CORPORATION; RAYTHEON TECHNOLOGIES CORPORATION (f/k/a United Technologies Corporation); NATIONAL FOAM, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; ARKEMA, INC.; BASF CORPORATION; CHEMDESIGN PRODUCTS, INC.; CLARIANT CORPORATION; CHEMICALS INCORPORATED; NATION FORD CHEMICAL COMPANY; AGC INC. (f/k/a Asahi Glass Co., Ltd.); AGC CHEMICALS AMERICAS INC.; DEEPWATER CHEMICALS, INC.; DYNAX CORPORATION; ARCHROMA MANAGEMENT, LLC; ARCHROMA U.S., INC.; AND JOHN DOE DEFENDANTS 1-49, | |
| Defendants. | |

122271583-1

# NOTICE

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a Usted en la corte. Si Usted quiere defenderse ante las demandas expuestas en las paginas siguientes, Usted tiene viente (20) dias de plazo a partir de la fecha de la demanda y la notificación. Hace falta asentar un comparencia escrita en persona o con un abogado y entregar a la corte en forma escrita sus defensas u objeciones a la demandas en contra de su persona. Sea avisado que si Usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Ademas la corte puede decidir a favor del demandante y requerir que Usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o propiedades u otros derechos personales importantes. |
| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER AND/OR WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED RATE OR NO FEE. | LLEVE ESTA DEMANDA A SU ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE PARA CONTRATAR UN ABOGADO, DEBE IR PERSONALMENTE O LLAMAR A LA OFICINA CUYA DIRECCIÓN SE ENCUENTRA ABAJO. ESTA OFICINA LE PUEDE DAR INFORMACIÓN SOBRE CONTRATAR UN ABOGADO Y/O INFORMACIÓN SOBRE AGENCIAS QUE PODRIAN OFRECER SERVICIOS LEGALES A PERSONAS CON NECESIDAD A UN PRECIO REDUCIDO O GRATUITO. |
| **DELAWARE COUNTY BAR ASSOCIATION**<br>Front and Lemon Streets<br>P. O. Box 466<br>Media, PA 19063<br>Tel: 610-566-6625 | **DELAWARE COUNTY BAR ASSOCIATION**<br>Front and Lemon Streets<br>P. O. Box 466<br>Media, PA 19063<br>Tel: 610-566-6625 |

122271583-1

## COMPLAINT IN CIVIL ACTION

AND NOW, come the Plaintiffs, the Commonwealth of Pennsylvania, acting by and through Delaware County District Attorney Jack Stollsteimer, Delaware County, and Primos-Secane-Westbrook Park Fire Company #5 of Upper Darby Pennsylvania, Inc. (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this action against Defendants, 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), E. I. DuPont De Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours, Inc., Corteva, Inc., Chemguard, Inc., Tyco Fire Products LP (successor-in-interest to The Ansul Company), Kidde-Fenwal, Inc., Kidde PLC, Inc., Chubb Fire, Ltd., UTC Fire & Security Americas Corporation, Inc., Carrier Global Corporation, Raytheon Technologies Corporation (f/k/a United Technologies Corporation), National Foam, Inc., Buckeye Fire Equipment Company, Arkema, Inc., BASF Corporation, ChemDesign Products, Inc., Clariant Corporation, Chemicals Incorporated, Nation Ford Chemical Company, AGC Inc. (f/k/a Asahi Glass Co., Ltd.), AGC Chemicals Americas, Inc., Deepwater Chemicals, Inc., Dynax Corporation, Archroma Management, LLC, Archroma U.S., Inc., and John Doe Defendants 1-49 (collectively, "Defendants"), and allege as follows:

## SUMMARY OF THE CASE

1.      The Commonwealth of Pennsylvania, acting by and through the Delaware County District Attorney, Jack Stollsteimer ("DA Plaintiff"), brings this action against Defendants to (i) enjoin Defendants from continuing to violate Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") now and in the future, (ii) require Defendants to disgorge all monies acquired or retained as a result of their violations of the UTPCPL, and (iii) recover any and all penalties, fines, restorative relief and other recoverable damages due to his office and the people of Delaware County, Haverford Township, and Primos-Secane Westbrook Park Fire Company #5 of Upper Darby Pennsylvania, Inc. ("Secane") as a result of the actions

3

and inactions of Defendants as set forth herein.  Plaintiffs, Delaware County and Primos-Secane Westbrook Park Fire Company #5 of Upper Darby Pennsylvania, Inc. bring this action against Defendants to recover all past and future compensatory and/or consequential damages for the investigation, remediation, removal, disposal, treatment, and monitoring of the ongoing contamination of its surface water, groundwater, wastewater, soil and sediment caused and/or created by Defendants' products, diminished property value, punitive damages, attorneys' fees and costs, as well as any and all other damages available as a result of the actions and/or inactions of Defendants.

2.      Jack Stollsteimer, District Attorney for Delaware County, is an elected official of Delaware County and has "all the powers and duties granted by [C]ommonwealth law, by laws applicable to Counties of the Second Class A for District Attorneys, by the Home Rule Charter, by this chapter, or by ordinance of [Delaware] County Council."[1]  DA Stollsteimer is statutorily permitted to bring this action in the name of the Commonwealth to hold Defendants accountable for violations of the UTPCPL pursuant to 73 P.S. § 201-4.  DA Stollsteimer brings this action on behalf of all persons in interest, including Delaware County, Haverford Township and Secane.

3.      Delaware County and Haverford Township are municipal corporations organized and existing under the laws of the State of Pennsylvania. Primos-Secane-Westbrook Park Fire Company #5 of Upper Darby Pennsylvania, Inc. is a non-profit corporation organized and existing under the laws of the State of Pennsylvania.

4.      Delaware County and Primos-Secane-Westbrook Park Fire Company #5 of Upper Darby Pennsylvania, Inc. are hereinafter collectively referred to as "Municipal Plaintiffs."

---

[1] Delaware County, PA Administrative Code Article XV § 6-110.

4

5.      Plaintiff, Delaware County, is the owner of lands, properties, facilities, and infrastructure within Delaware County, Pennsylvania, including but not limited to the Delaware County Emergency Services Training Center ("DelCo Training Center").

6.      Haverford Township, is the owner of lands, properties, facilities, and infrastructure within Delaware County, Pennsylvania, including but not limited to the Haverford Township Recycling Drop-Off Center, located at a fire training area ("Recycling Center").

7.      Plaintiff, Primos-Secane-Westbrook Park Fire Company #5 of Upper Darby Pennsylvania, Inc., is the owner of lands, properties, facilities, and infrastructure within Delaware County, Pennsylvania ("Primos Station").

8.      DelCo Training Center and Primos Station are hereinafter collectively referred to as, "Municipal Plaintiffs' Properties."

9.      Per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), were discovered in water and soil resources at Municipal Plaintiffs' Properties.

10.      PFOA and PFOS are man-made compounds that are toxic and persistent in the environment, do not biodegrade, move readily through soil and groundwater, and pose a significant risk to human health and safety.

11.      At various times from the 1960s through today, Defendants designed, manufactured, formulated, marketed, distributed, and/or sold PFOA, PFOS, the chemical precursors of PFOA and/or PFOS, and/or aqueous film-forming foam ("AFFF") containing PFOA, PFOS and/or their chemical precursors (collectively, "Fluorosurfactant Products").

12.      AFFF is a firefighting agent used to control and extinguish Class B fuel fires and is used at sites such as military bases, airports, petroleum refineries, and fire training centers.

5

122271583-1

13.     Defendants designed, manufactured, marketed, distributed, and/or sold Fluorosurfactant Products with the knowledge that these toxic compounds would be released into the environment during fire protection, training, and response activities, even when used as directed and intended by the Defendants.

14.     Upon information and belief, at all times pertinent herein, Defendants' Fluorosurfactant Products have been released, used, stored, and/or disposed of at or near Municipal Plaintiffs' Properties for fire protection, training and response activities.  During these activities, Defendants' Fluorosurfactant Products were stored, used, cleaned up, and/or disposed of as directed and intended by the Defendants, which allowed PFOS, PFOA, and/or their chemical precursors to enter the environment, and migrate through the soil, sediment, surface water, and groundwater, thereby contaminating Municipal Plaintiffs' Properties.

15.     As a result of the use of Defendants' Fluorosurfactant Products for their intended purpose, PFOS, PFOA, and/or their chemical precursors have been detected in the soil and groundwater of Municipal Plaintiffs' Properties.

16.     Municipal Plaintiffs' Properties have been, and continue to be, contaminated by Defendants' Fluorosurfactant Products.

17.     At all times pertinent herein, Plaintiffs did not know, nor should Plaintiffs have known, of the ongoing contamination of Municipal Plaintiffs' Properties through the use, release, storage, and/or disposal of Defendants' Fluorosurfactant Products as Defendants did not disclose the toxic nature and harmful effects of these Fluorosurfactant Products.

18.     Through this action, Plaintiffs seek to recover compensatory and/or consequential damages for all past and future costs to investigate, remediate, remove, dispose of, treat, and monitor the PFOS and PFOA contamination of Municipal Plaintiffs' Properties caused by the use of Defendants' Fluorosurfactant Products on Municipal Plaintiffs' Properties, together with

statutory fines and penalties for each violation of the UTPCPL, disgorgement of monies received by Defendants as a result of their deceptive conduct, and any and all other damages recoverable under state and/or applicable federal laws. Municipal Plaintiffs also seek damages and restitution for the diminution of value of their Properties. Plaintiffs also seek attorneys' fees and costs, and all other damages this court deems just and equitable.

## PARTIES

19.     Jack Stollsteimer, District Attorney for Delaware County, is an elected official of Delaware County. DA Stollsteimer is statutorily permitted to bring this action in the name of the Commonwealth to hold Defendants accountable for violations of the UTPCPL pursuant to 73 P.S. § 201-4.

20.     Plaintiff Delaware County is a municipal corporation organized and existing under the laws of the State of Pennsylvania and located at 201 West Front Street, Media, PA 19063. The District Attorney seeks to recover the amounts to which he is entitled on behalf of Delaware County pursuant to the statutory rights afforded him under the UTPCPL.

21.     Haverford Township is a municipal corporation organized and existing under the laws of the State of Pennsylvania and located at 1014 Darby Road, Havertown, PA 19083. The District Attorney seeks to recover the amounts to which he is entitled on behalf of Haverford Township pursuant to the statutory rights afforded him under the UTPCPL.

22.     Plaintiff Primos-Secane-Westbrook Park Fire Company #5 of Upper Darby Pennsylvania, Inc. is a non-profit corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business located at 1005 Secane Avenue, Secane, PA 19018. The District Attorney seeks to recover the amounts to which he is entitled on behalf of Secane pursuant to the statutory rights afforded him under the UTPCPL.

23.     Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, promoted, distributed, and/or sold the Fluorosurfactant Products that have and continue to contaminate Municipal Plaintiffs' Properties:

a.  Defendant J ("3M") is a Delaware corporation authorized to conduct business in Pennsylvania, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144.  3M is the only company that manufactured and/or sold AFFF containing PFOS in the United States, including Pennsylvania.

b.  Defendant E. I. DuPont De Nemours and Company ("DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.  DuPont is registered to do business in Pennsylvania.

c.  Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.  Chemours is registered to do business in Pennsylvania.

d.  In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of fluorosurfactants and the products that contain fluorosurfactants.

e.  Defendant The Chemours Company FC, LLC ("Chemours FC"), successor-in-interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company with its principal place of business located at 1007 Market Street

8

Wilmington, Delaware, 19899. Chemours FC is registered to do business in Pennsylvania.

    f.   Defendant DuPont de Nemours, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805. Upon information and belief, DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont. DowDuPont, Inc. was subsequently divided into three publicly traded companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc. ("New DuPont"). Upon information and belief, New DuPont does and/or has done business throughout the United States, including Pennsylvania.

    g.   Defendant Corteva, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Upon information and belief, Corteva, Inc. is one of the aforementioned spin-off companies from DowDuPont, Inc., and is believed to have assumed some of the PFAS liabilities of the former DuPont. Corteva, Inc. is registered to do business in Pennsylvania.

    h.   Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Upon information and belief, Chemguard does and/or has done business throughout the United States, including in Pennsylvania.

    i.   Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446. Tyco acquired Chemguard in 2011. Tyco is registered to do business in Pennsylvania.

9

j. Tyco is the successor-in-interest to The Ansul Company ("Ansul") and manufactures the Ansul brand of products (Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco/Ansul"). Upon information and belief, Tyco/Ansul does and/or has done business throughout the United States, including in the State of Pennsylvania.

k. Defendant Kidde-Fenwal, Inc. ("Kidde") is a Delaware corporation with its principal place of business located at One Financial Plaza, Hartford, Connecticut 06101. Upon information and belief, Kidde was part of UTC Fire & Security Americas Corporation, Inc. Upon information and belief, Kidde-Fenwal, Inc. is the successor-in-interest to Kidde Fire Fighting, Inc. (collectively, "Kidde/Kidde Fire"). Upon information and belief, Kidde/Kidde Fire does and/or has done business throughout the United States, including in Pennsylvania.

l. Defendant Kidde PLC, Inc. is a Delaware corporation with its principal place of business located at 9 Farm Springs Road, Farmington, Connecticut 06032. Upon information and belief, Kidde PLC, Inc. was part of UTC Fire & Security Americas Corporation, Inc. Upon information and belief, Kidde PLC, Inc. does and/or has done business throughout the United States, including in Pennsylvania.

m. Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, United Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. Upon information and belief, Chubb was part of UTC Fire & Security Americas Corporation, Inc.

n.  Defendant UTC Fire & Security Americas Corporation, Inc. ("UTC") is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach Gardens, Florida 33418. Upon information and belief, UTC was a division of United Technologies Corporation. UTC is registered to do business in Pennsylvania.

o.  Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Upon information and belief, UTC is now a division of Carrier. Upon information and belief, Carrier does and/or has done business throughout the United States, including in Pennsylvania.

p.  Defendant Raytheon Technologies Corporation (f/k/a United Technologies Corporation) ("Raytheon Tech f/k/a United Tech") is a Delaware corporation with its principal place of business at 10 Farm Springs Road, Farmington, Connecticut 06032. Upon information and belief, Raytheon Tech f/k/a United Tech does and/or has done business in Pennsylvania.

q.  Defendant National Foam, Inc. ("National Foam") is a Delaware corporation with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. National Foam is a subsidiary of Angus International Safety Group, Ltd. Upon information and belief, National Foam manufactures the Angus brand of AFFF products. National Foam is registered to do business in Pennsylvania.

r.  Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086. Upon information and belief, Buckeye does and/or has done business throughout the United States, including Pennsylvania.

11

s.  Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema is registered to do business in Pennsylvania.

t.  Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals. BASF is registered to do business in Pennsylvania. Upon information and belief, Ciba-Geigy Corporation and/or Ciba Specialty Chemicals does and/or has done business throughout the United States, including Pennsylvania.

u.  Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF. Upon information and belief, ChemDesign does and/or has done business throughout the United States, including Pennsylvania.

v.  Defendant Clariant Corporation ("Clariant") is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF. Clariant is registered to do business in Pennsylvania.

w.  Defendant Chemicals Incorporated ("Chem Inc.") is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF. Upon information and belief, Chem Inc. does and/or has done business throughout the United States, including Pennsylvania.

12

x.   Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF. Upon information and belief, Nation Ford does and/or has done business throughout the United States, including Pennsylvania.

y.   Defendant AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC"), is a corporation organized under the laws of Japan and doing business throughout the United States. AGC has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

z.   Defendant AGC Chemicals Americas, Inc. ("AGC America") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. Upon information and belief, AGC America is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd. AGC America is registered to do business in Pennsylvania.

aa.   Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business located at 196122 E County Road 40, Woodward, Oklahoma 73801. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF. Upon information and belief, Deepwater does and/or has done business throughout the United States, including Pennsylvania.

bb.   Defendant Dynax Corporation ("Dynax") is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523. Upon information and belief, this Defendant manufactured

Fluorosurfactant Products for use in AFFF. Upon information and belief, Dynax does and/or has done business throughout the United States, including Pennsylvania.

cc. Defendant Archroma Management, LLC, is a foreign limited liability company registered in Switzerland, with a principal business address of Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

dd. Defendant Archroma U.S., Inc. is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied Fluorosurfactant Products for use in AFFF. Archroma U.S., Inc. is registered to do business in Pennsylvania.

ee. Upon information and belief, Defendants John Doe 1-49 were designers, manufacturers, marketers, distributors, and/or sellers of Fluorosurfactant Products that have and continue to contaminate Municipal Plaintiffs' Properties. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiff will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

24.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

25.     When the term "Defendants" is used alone, it refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to

adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

## JURISDICTION AND VENUE

26.     Venue is proper in Delaware County because it is the judicial district in which Plaintiffs reside and are citizens, a substantial part of the property that is the subject of this action is situated in the judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS

### A. THE CONTAMINANTS: PFOA & PFOS

27.     PFOA and PFOS are man-made chemicals within a class known as perfluoroalkyl acid ("PFAA"). PFAAs are part of the larger chemical family known as per- and polyfluoroalkyl substances ("PFAS"). PFAA is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature, which is a reason why these molecules are so persistent. PFOA and PFOS contain eight carbon-fluorine bonds. For this reason, they are sometimes referred to as "C8."

28.     PFOA and PFOS are highly water soluble, which increases the rate at which they spread throughout the environment, contaminating soil, groundwater, and surface water. Their mobility is made more dangerous by their persistence in the environment and resistance to biologic, environmental, or photochemical degradation.[2]

---

[2] See EPA, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA), EPA Document Number: 822-R-16-005 (May 2016) at 16; and Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS), EPA Document Number: 822-R-16-004 (May 2016) at 16, both available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

122271583-1

29.     PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver.  They have been found globally in water, soil, air, as well as in human food supplies, breast milk, umbilical cord blood, and human serum.[3]

30.     PFOA and PFOS are persistent in the human body. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[4]

31.     Since they were first produced, information has emerged showing negative health effects caused by exposure to PFOA and PFOS.

32.     According to the United States Environmental Protection Agency ("EPA"), "…studies indicate that exposure of PFOA and PFOS over certain levels may result in…developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."[5]

33.     EPA has also warned that "there is suggestive evidence of carcinogenic potential for PFOS."[6]

34.     EPA has noted that "drinking water can be an additional source [of PFOA/PFOS in the body] in the small percentage of communities where these chemicals have contaminated water supplies." In communities with contaminated water supplies, "such contamination is

---

[3] *See* EPA Document Number: 822-R-16-005 (May 2016) at 18-20, 25-27; and EPA Document Number: 822-R-16-004 (May 2016) at 19-21, 26 28.

[4] *See* EPA Document Number: 822-R-16-005 (May 2016) at 55; and EPA Document Number: 822-R-16-004 (May 2016) at 55.

[5] *See* "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

[6] *See* "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)" U.S. Environmental Protection Agency Office of Water Health and Ecological Criteria Division, EPA Document Number: 822-R-16-002, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

typically localized and associated with a specific facility, for example…an airfield at which [PFOA/PFOS] were used for firefighting."[7]

35.     EPA has issued Health Advisory Levels of 70 parts per trillion ("ppt") for PFOA and PFOS found in drinking water.  When both PFOA and PFOS are found in drinking water, the combined concentrations should not exceed 70 ppt.

### B. AQUEOUS FILM-FORMING FOAM

36.     AFFF is a type of water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports and military bases, among other places.

37.     The AFFF designed, manufactured, marketed, distributed, and/or sold by Defendants contained either or both PFOA and PFOS, or the chemical precursors to PFOA or PFOS.

38.     PFOS and/or the chemical precursors to PFOS contained in 3M's AFFF were manufactured by 3M's patented process of electrochemical fluorination ("ECF").

39.     All other Defendants manufactured fluorosurfactants for use in AFFF through the process of telomerization.  Telomerization produced fluorotelomers, including PFOA and/or the chemical precursors to PFOA.

40.     AFFF can be made without PFOA, PFOS, or their precursor chemicals. Fluorine-free foams and short-chains foams do not release PFOA, PFOS, and/or their precursor chemicals into the environment.

41.     AFFF is used to extinguish fires that are difficult to fight, particularly fires that involve petroleum or other flammable liquids. AFFF is typically applied to a fire, where it works to blanket the ignited fuel source, preventing its contact with oxygen and suppressing combustion.

---

[7] See "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

42.     When used as the Defendants intended and directed, Defendants' AFFF releases PFOA, PFOS, and/or their precursor chemicals into the environment.

43.     Once PFOA and PFOS are free in the environment, these chemicals do not hydrolyze, photolyze, or biodegrade under typical environmental conditions and are extremely persistent in the environment. As a result of their persistence, they are widely distributed throughout soil, air, and groundwater.

44.     The use of Defendants' Fluorosurfactant Products as directed and intended by the Defendants allowed PFOA, PFOS, and/or their precursor chemicals to enter into and onto Municipal Plaintiffs' Properties where these compounds migrated through the subsurface and into the groundwater, thereby contaminating the surface water, soil, sediment, and groundwater, as well as causing other extensive and ongoing damage to Municipal Plaintiffs' Properties.

45.     Due to the chemicals' persistent nature, among other things, these chemicals have, and continue to cause injury and damage to Municipal Plaintiffs' Properties.

**C.  DEFENDANTS' KNOWLEDGE OF PFOA AND PFOS HAZARDS**

46.     On information and belief, by the early 1980s, Defendants knew, or reasonably should have known, among other things, that: (a) PFOA and PFOS are toxic; and (b) when sprayed in the open environment per the instructions given by the manufacturer, PFOA and PFOS readily migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

47.     Defendants also knew or reasonable should have known that PFOA and PFOS could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.

18

48.     In 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.[8]

49.     By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

50.     In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[9]

51.     Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[10]

52.     Based on information and belief, in 2000, under pressure from the EPA, 3M announced that it was phasing out PFOS and U.S. production of PFOS; 3M's PFOS-based AFFF production did not fully phase out until 2002.

53.     From 1951, DuPont, and on information and belief, Chemours, designed, manufactured, marketed, and sold Fluorosurfactant Products, including Teflon nonstick

---

[8] *See* Letter from 3M to Office of Pollution Prevention and Toxics, EPA titled "TSCA 8e Supplemental Submission, Docket Nos. 8EHQ-0373/0374 New Data on Half Life of Perfluorochemicals in Serum," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.
[9] *See* Memorandum "C-8 Blood Sampling Results, Births and Pregnancies," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.
[10] *See* Memorandum "Organic Fluorine Levels," August 31, 1984, available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

19

cookware, and more recently PFAS feedstocks, such as Forafac 1157 N, for the use in the manufacture of AFFF products.

54.    Based on information and belief, in 2001 or earlier, DuPont manufactured, produced, marketed, and sold Fluorosurfactant Products and/or PFAS feedstocks to some or all of the AFFF product manufacturers for use in their AFFF products that were discharged into the environment and contaminated Municipal Plaintiffs' Properties.

55.    DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment.[11]

56.    By December 2005, the EPA uncovered evidence that DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History."[12] The EPA fined DuPont for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the EPA substantial risk information about chemicals they manufacture, process or distribute in commerce."[13]

57.    By July 2011, DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified DuPont of a "probable link"[14] between

---

[11] *See, e.g.,* Fred Biddle, "DuPont confronted over chemical's safety," *Wilmington News Journal* (Apr. 13, 2003). The *Wilmington News Journal* is published in Wilmington, Ohio.

[12] $16.5 million.

[13] U.S.Envtl. Prot. Agency, Reference News Release, "EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History" (Dec. 14, 2005), https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental (last viewed on January 30, 2018).

[14] Under the settlement, "probable link," means that given the available scientific evidence, it is more likely than not that among class members a connection exists between PFOA/C8 exposure and a particular human disease.

20

PFOA exposure and the serious (and potentially fatal) conditions of pregnancy-induced hypertension and preeclampsia.[15]  By October 2012, the C8 Science Panel had notified DuPont of a probable link between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

58.     In July 2015, DuPont spun off its chemicals division by creating Chemours as a new publicly-traded company, once wholly owned by DuPont. By mid-2015, DuPont had dumped its perfluorinated chemical liabilities into the lap of the new Chemours.

59.     Notwithstanding this knowledge, Defendants negligently and carelessly: (1) designed, manufactured, marketed, distributed, and/or sold Fluorosurfactant Products; (2) issued instructions on how Fluorosurfactant Products should be used and disposed of (namely, by washing the foam into the soil or wastewater system), thus improperly permitting PFOA and/or PFOS to contaminate the surface water, soil, and groundwater in and around the Municipal Plaintiffs' Properties; (3) failed to recall and/or warn the users of Fluorosurfactant Products, negligently designed products containing or degrading into PFOA and/or PFOS, of the dangers of surface water, soil, and groundwater contamination as a result of standard use and disposal of these products; and (4) further failed and refused to issue the appropriate warnings and/or recalls to the users of Fluorosurfactant Products, notwithstanding the fact that Defendants knew the identity of the purchasers of the Fluorosurfactant Products.

60.     As a direct result of Defendants' actions and/or inactions alleged in this Complaint, Municipal Plaintiffs' Properties have been and will continue to be contaminated with PFAS, including PFOA and PFOS, creating an environmental hazard, unless such contamination is remediated.  As a direct and proximate result of Defendants' actions and/or inactions, Plaintiffs

---

[15] *See* The C8 Science Panel, Status Report: PFOA (C8) exposure and pregnancy outcome among participants in the C8 Health Project (July 15, 2011), http://www.c8sciencepanel.org/pdfs/Status_Report_C8_and_pregnancy_outcome_15July2011.pdf (last viewed on January 28, 2018).

122271583-1

must assess, evaluate, investigate, monitor, remove, clean up, correct, treat, and remediate PFOA and PFOS contamination on Municipal Plaintiffs' Properties at significant expense, loss and damage.

61.     Defendants had a duty and breached their duty to evaluate and test such Fluorosurfactant Products adequately and thoroughly to determine their potential human health and environmental impacts before they sold such products. They also had a duty and breached their duty to minimize the environmental harm caused by Fluorosurfactant Products.

### D. THE IMPACT OF PFOA AND PFOS ON MUNICIPAL PLAINTIFFS' PROPERTIES

62.     PFOA and PFOS have been detected in varying amounts in soil and water extracted from Municipal Plaintiffs' Properties. PFOA and PFOS have been detected and/or are present in certain of areas of Municipal Plaintiffs' Properties. PFOA and PFOS have been detected at Municipal Plaintiffs' Properties at levels that are substantially greater than the current State and Federal Advisory Levels. The detection and/or presence of PFOA and PFOS, and the threat of further detection and/or presence of PFOA and PFOS, in Municipal Plaintiffs' Properties in varying amounts has resulted, and will continue to result, in significant injuries and damage to Plaintiffs.

63.     Upon information and belief, the invasion of Municipal Plaintiffs' Properties with PFOA and PFOS is recurring, resulting in new harm to Plaintiffs on each occasion.

64.     The injuries to Plaintiffs caused by Defendants' conduct constitute an unreasonable interference with, and damage to, Plaintiffs and Municipal Plaintiffs' Properties. Plaintiffs' interests in protecting Municipal Plaintiffs' Properties constitute a reason for seeking damages sufficient to restore such Properties to their pre-contamination condition, in addition to the other damages, statutory fines and penalties, and injunctive relief sought herein.

22

## FIRST CAUSE OF ACTION

### (Municipal Plaintiffs)

## STRICT LIABILITY – DESIGN DEFECT AND/OR DEFECTIVE PRODUCT

65.     Municipal Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

66.     Defendants, at all times relevant herein, were designers, manufacturers, marketers, sellers and/or distributors of Fluorosurfactant Products.

67.     As designers, manufacturers, marketers, sellers and/or distributors of Fluorosurfactant Products, Defendants owed a duty to all persons whom Defendants' Fluorosurfactant Products might foreseeably harm, including Municipal Plaintiffs, not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

68.     Defendants' Fluorosurfactant Products were distributed, sold, and used in a manner intended and reasonably foreseen by Defendants, and reached consumers and the environment in a condition substantially unchanged from that in which they left Defendants' control.

69.     Municipal Plaintiffs were harmed by Fluorosurfactant Products that were designed, manufactured, marketed, sold and/or distributed by Defendants, and which were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

70.     Defendants' Fluorosurfactant Products did not perform as safely as an ordinary consumer would have expected them to perform when used or misused in an intended or reasonably foreseeable way.

71.     Defendants represented, asserted, claimed and/or warranted that their Fluorosurfactant Products could be used in conformity with accompanying instructions and labels in a manner that would not cause injury or damage.

23

72.     Defendants' Fluorosurfactant Products used on and/or in the vicinity of Municipal Plaintiffs' Properties were used in a reasonably foreseeable manner and without substantial change in the condition in which they were sold.

73.     Defendants knew, or should have known, that use of Defendants' Fluorosurfactant Products in their intended manner would result in the spillage, discharge, disposal, or release of PFOA and/or PFOS into the surface water, soil, and groundwater.

74.     Furthermore, Defendants knew, or should have known, that their Fluorosurfactant Products are toxic, could not be contained, are persistent and do not readily degrade in the environment.

75.     Defendants, with knowledge of the risks, failed to use reasonable care in the design of their Fluorosurfactant Products.

76.     Municipal Plaintiffs were, are and will continue to be harmed by Defendants' defectively designed Fluorosurfactant Products.

77.     Defendants' Fluorosurfactant Products' failure to perform safely was a substantial factor in causing Municipal Plaintiffs' harm.

78.     The gravity of the environmental harm resulting from Defendants' Fluorosurfactant Products was, is, and will be enormous because PFOA and PFOS contamination is widespread, persistent and toxic.

79.     The likelihood that this harm would occur was, is, and will be very high because Defendants knew and/or should have known that Defendants' Fluorosurfactant Products were toxic, could not be contained, and do not readily degrade in the environment.

80.     At the time of manufacture, there were safer alternative designs available to Defendants that were feasible, cost effective, and advantageous, including not using PFOS, PFOA and/or their precursor chemicals in their Fluorosurfactant Products.

81.     As a direct and proximate result of Defendants' above described acts and omissions, all of which are violations of applicable state and/or federal laws, Municipal Plaintiffs have incurred, continue to incur, and/or will incur costs and damages related to the PFAS contamination of their Properties, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

82.     Additionally, because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon Municipal Plaintiffs, Municipal Plaintiffs are entitled to punitive damages.

### SECOND CAUSE OF ACTION

### (Municipal Plaintiffs)

### STRICT LIABILITY - FAILURE TO WARN

83.     Municipal Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

84.     As manufacturers, distributors, suppliers, sellers, and marketers of Fluorosurfactant Products, Defendants had a duty to issue warnings to Plaintiffs, the public, water providers, and public officials of the risks posed by PFOA and PFOS.

85.     Defendants knew that their Fluorosurfactant Products would be purchased, transported, stored, handled, and used without notice of the hazards that PFOA and PFOS pose to human health and the environment.

86.     Defendants knew, or should have known, that use of Defendants' Fluorosurfactant Products in their intended manner would result in the release of PFOA and/or PFOS into the surface water, soil, and groundwater.

87.     Defendants breached their duty to warn by unreasonably failing to provide Plaintiffs, public officials, purchasers, downstream handlers, and/or the general public with warnings about the potential and/or actual contamination of the environment by PFOA and PFOS, despite Defendants' knowledge that PFOA and PFOS were real and potential threats to human health and the environment.

88.     Fluorosurfactant Products purchased or otherwise acquired from Defendants were used, discharged, and/or released at and/or in the vicinity of Municipal Plaintiffs' Properties.

89.     Defendants' Fluorosurfactant Products were used in a reasonably foreseeable manner and without substantial changes in the condition in which the Products were sold.

90.     Defendants' Fluorosurfactant Products used on and/or in the vicinity of Municipal Plaintiffs' Properties were defective in design and unreasonably dangerous for the reasons set forth above.

91.     Despite the known and/or foreseeable environmental and human health hazards associated with the use and/or disposal of Defendants' Fluorosurfactant Products on or near Municipal Plaintiffs' Properties, including contamination of Municipal Plaintiffs' Properties with PFOA and/or PFOS, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

92.     In particular, Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their Fluorosurfactant Products.

93.     As a direct and proximate result of Defendants' above described acts and omissions, all of which are violations of applicable state and/or federal laws, Municipal Plaintiffs have incurred, continue to incur, and/or will incur costs and damages related to the PFAS contamination of their Properties, including but not limited to the investigation, monitoring,

treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

94.     Additionally, because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon Municipal Plaintiffs, Municipal Plaintiffs are entitled to punitive damages.

## THIRD CAUSE OF ACTION

### (Municipal Plaintiffs)

### NUISANCE

95.     Municipal Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

96.     Defendants designed, manufactured, distributed, marketed, and/or sold their Fluorosurfactant Products in a manner that created, or participated in creating, a nuisance that unreasonably endangers or injures the property, health, safety, and comfort of the general public and Municipal Plaintiffs, causing inconvenience and annoyance.

97.     Defendants, by their negligent, reckless and willful acts and omissions set forth above have, among other things, knowingly unleashed long-lasting and ongoing PFOA and/or PFOS contamination and threat of contamination to Municipal Plaintiffs' Properties.

98.     Actual and threatened PFOA and/or PFOS contamination caused by Defendants' conduct has caused, and continues to cause, injury to Municipal Plaintiffs in the form of present and serious interference with the use, benefit, and/or enjoyment of their Properties in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.

99.     The nuisance that Defendants have inflicted upon Municipal Plaintiffs is substantial, unreasonable, and intentional or negligent.

122271583-1

100.    Defendants' conduct has also injured, and continues to injure, the property, health, safety, and/or comfort of a considerable number of persons.

101.    Defendants knew or, in the exercise of reasonable care, should have known that the use and introduction of their Fluorosurfactant Products into the environment would and has continuously, unreasonably and seriously endangered and interfered with the ordinary safety, use, benefit, and enjoyment of Municipal Plaintiffs' Properties by Municipal Plaintiffs.

102.    As a direct and proximate result of Defendants' above described acts and omissions, all of which are violations of applicable state and/or federal laws, Municipal Plaintiffs have incurred, continue to incur, and/or will incur costs and damages related to the PFAS contamination of their Properties, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

103.    Additionally, because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon Municipal Plaintiffs, Municipal Plaintiffs are entitled to punitive damages.

## FOURTH CAUSE OF ACTION

### (Municipal Plaintiffs)

### TRESPASS

104.    Municipal Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

105.    Municipal Plaintiffs are the owners and/or actual possessors of Municipal Plaintiffs' Properties and other relevant structures located thereon. Defendants knew, or in the exercise of reasonable care should have known, that PFOA and/or PFOS contaminates soil, surface, and groundwater, including the property and other rights of Municipal Plaintiffs.

28

122271583-1

106.     Defendants failed to properly warn against the use of Fluorosurfactant Products such that they proximately caused and continue to cause PFOA and/or PFOS to contaminate Municipal Plaintiffs' Properties, including but not limited to their soil, sediment, surface water, groundwater, and other structures located thereon.

107.     The contamination of Municipal Plaintiffs' Properties has varied over time and has not yet ceased. PFOA and/or PFOS continue to migrate onto and enter Municipal Plaintiffs' Properties. The contamination is reasonably abatable.

108.     Municipal Plaintiffs have not consented to, and do not consent to, this trespass or contamination.

109.     Defendants knew or reasonably should have known that Municipal Plaintiffs would not consent to this trespass.

110.     Municipal Plaintiffs were, are, and will continue to be harmed by the entry of Defendants' Fluorosurfactant Products onto their Properties.

111.     As a direct and proximate result of Defendants' above described acts and omissions, all of which are violations of applicable state and/or federal laws, Municipal Plaintiffs have incurred, continue to incur, and/or will incur costs and damages related to the PFAS contamination of their Properties, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

112.     Additionally, because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon Municipal Plaintiffs, Municipal Plaintiffs are entitled to punitive damages.

## FIFTH CAUSE OF ACTION

### (Municipal Plaintiffs)

### NEGLIGENCE

113.     Municipal Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

114.     As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, and/or handlers of Fluorosurfactant Products, Defendants owed a duty to Municipal Plaintiffs, as well as to all persons whom Defendants' Fluorosurfactant Products might foreseeably harm, to exercise due care in the instructing, labeling, and warning of the handling, control, use, and disposal of Defendants' Fluorosurfactant Products.

115.     Despite the fact that Defendants knew that PFOA and PFOS are toxic, can contaminate soil and water resources, and present significant risks to human health and the environment, Defendants negligently: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold Fluorosurfactant Products; (b) issued instructions on how Fluorosurfactant Products should be used and disposed of, thus improperly permitting PFOA and/or PFOS to enter and contaminate Municipal Plaintiffs' Properties; (c) failed to warn the users of Fluorosurfactant Products of the dangers of soil and water contamination as a result of standard use and disposal of these products; and (d) failed and refused to issue the appropriate warnings to the users of Fluorosurfactant Products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their Fluorosurfactant Products.

122271583-1

116.     A reasonable manufacturer, seller, or distributor, under the same or similar circumstances would have warned of the danger or instructed on the safe use of Fluorosurfactant Products.

117.     Municipal Plaintiffs were, are, and will continue to be harmed by Defendants' Fluorosurfactant Products.

118.     Defendants' failure to warn or instruct was a substantial factor in causing Municipal Plaintiffs' harm.

119.     Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

120.     As a direct and proximate result of Defendants' above described acts and omissions, all of which are violations of applicable state and/or federal laws, Municipal Plaintiffs have incurred, continue to incur, and/or will incur costs and damages related to the PFAS contamination of their Properties, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

121.     Additionally, because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon Municipal Plaintiffs, Municipal Plaintiffs are entitled to punitive damages.

## SIXTH CAUSE OF ACTION

### (Municipal Plaintiffs)

### CIVIL CONSPIRACY

122.     Municipal Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

31

122271583-1

123.    At all times relevant herein, Defendants knew of the hazards that PFOA and/or PFOS posed to the environment, including Municipal Plaintiffs' Properties.

124.    Beginning in the 1960s and continuing through the date of the filing of this Complaint, Defendants agreed to engage in unlawful and wrongful acts that caused damage to Municipal Plaintiffs. Each Defendant performed at least one overt act in furtherance of this conspiracy. Specifically, Defendants colluded for the avowed purpose of providing information about Fluorosurfactant Products to the public and the government, with the true, unlawful purpose of:

        a.   intentionally misrepresenting to the EPA and the public that Fluorosurfactant Products were safe and did not pose a risk to human health and the environment;

        b.   concealing the dangers of Fluorosurfactant Products, including the Products' characteristics and their propensity to contaminate soil and groundwater, from the government and public by, among other means, repeatedly misrepresenting how Fluorosurfactant Products were being disposed of;

        c.   concealing the dangers of PFOA and/or PFOS from consumers and the public; and

        d.   using their considerable resources to fight legislation concerning Fluorosurfactant Products.

125.    As a direct and proximate result of Defendants' conspiracy, Defendants' Fluorosurfactant Products at all times relevant to this litigation have:

        a.   posed and continue to pose a threat to Municipal Plaintiffs' Properties;

        b.   contaminated and will continue to contaminate Municipal Plaintiffs' Properties;

   c.   contaminated and will continue to contaminate the soil, surface and groundwater on and within the vicinity of Municipal Plaintiffs' Properties;

   d.   required and will continue to require testing and monitoring of Municipal Plaintiffs' Properties for PFOA and PFOS contamination;

   e.   required or will require remediation of PFOA and PFOS contamination or, where remediation is impracticable or insufficient for Municipal Plaintiffs, removal and disposal of the contamination;

   f.   diminished Municipal Plaintiffs' confidence in, and the use and enjoyment of, Municipal Plaintiffs' Properties;

   g.   diminished the value of Municipal Plaintiffs' Properties due to actual, impending, and/or threatened PFOA and PFOS contamination; and

   h.   caused and/or will cause Municipal Plaintiffs to sustain substantially increased damages and expenses resulting from the loss of the safety, use, benefit and/or enjoyment of their Properties.

126.    As a direct and proximate result of Defendants' above described acts and omissions, all of which are violations of applicable state and/or federal laws, Municipal Plaintiffs have incurred, continue to incur, and/or will incur costs and damages related to the PFAS contamination of their Properties, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

127.    Additionally, because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon Municipal Plaintiffs, Municipal Plaintiffs are entitled to punitive damages.

122271583-1

## SEVENTH CAUSE OF ACTION

### (Municipal Plaintiffs)

### FRAUDULENT TRANSFER (DUPONT AND CHEMOURS)

128.    Municipal Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

129.    Municipal Plaintiffs seek equitable and other relief pursuant to the Uniform Fraudulent Transfer Act against DuPont.

130.    Upon information and belief, in February 2014, DuPont formed The Chemours Company as a wholly-owned subsidiary, and used it to spin off DuPont's "Performance Chemicals" business line in July 2015.

131.    Upon information and belief, at the time of the spinoff, DuPont's Performance Chemicals division contained the AFFF and/or PFAS business segments. In addition to the transfer of the Performance Chemicals division, Chemours accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFAS.

132.    Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture and sale of Fluorosurfactant Products.

133.    Upon information and belief, as a result of the transfer of assets and liabilities described in this Complaint, DuPont limited the availability of assets to cover judgements for all of the liability for damages and injuries from the manufacture and sale of Fluorosurfactant Products.

134.    Upon information and belief, DuPont has (a) acted with intent to hinder, delay and defraud parties, or (b) without receiving a reasonably equivalent value in exchange for the

transfer or obligation, and (i) was engaged or was about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

135.     Upon information and belief, DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties, such as the Municipal Plaintiffs, that have been damaged as a result of DuPont's actions as described in this Complaint.

136.     Upon information and belief, DuPont and Chemours acted without receiving a reasonably equivalent value in exchange for the transfer of obligations, and DuPont believed, or reasonably should have believed, that it would incur debts beyond Chemours' ability to pay as they became due.

137.     Municipal Plaintiffs seek to avoid the transfer of DuPont's liabilities for the claims brought in this Complaint and to hold DuPont jointly and severally liable for any damages or other remedies that may be awarded by this Court or a jury under this Complaint.

138.     Municipal Plaintiffs further reserve such other rights and remedies that may be available to them as may be necessary to fully compensate Municipal Plaintiffs for the damages and injuries they have suffered as alleged in this Complaint.

## **EIGHTH CAUSE OF ACTION**

### **(Commonwealth of PA, acting by and through the Delaware County District Attorney)**

**VIOLATION OF PENNSYLVANIA'S UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. §§ 201-1 – 201-9.3 (AGAINST ALL DEFENDANTS)**

139.     The DA Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

140.     This Count does not sound in fraud.

122271583-1

141.     The UTPCPL prohibits persons from employing "[u]nfair methods of competition" and "unfair or deceptive acts or practices," which are defined to include, *inter alia*, the following conduct:

a. "Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services." 73 P.S. § 201-2(4)(ii);

b. "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have . . . ." 73 P.S. § 201-2 (4)(v); or

c. "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2 (4)(xxi).

142.     Defendants are persons under the UTPCPL.

143.     Defendants violated the UTPCPL in that their conduct as alleged herein caused a likelihood of confusion or of misunderstanding as to the safety and nature of the chemicals at issue.

144.     Defendants violated the UTPCPL in that by their conduct as alleged herein they represented that the chemicals at issue had approval, characteristics, uses, benefits or qualities that they do not have.

145.     Under Pennsylvania law, an act or practice is unfair or deceptive if it had the capacity to deceive, or was likely to deceive, a substantial portion of the public, and was likely to make a difference in the purchasing decision.

146.     Defendants' conduct as alleged herein constitutes unfair or deceptive acts or practices in violation of the above provisions of the UTPCPL.

147.     As a direct result of the acts, omissions and practices of Defendants as set forth herein that are in violation of the UTPCPL, Defendants have received, and will continue to

receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the UTPCPL as alleged herein.

148.    As a direct result of Defendants' acts, omissions and practices in violation of the UTPCPL, the Municipal Plaintiffs and its affected residents and other persons in interest, such as Haverford Township and its residents, have suffered substantial injury as alleged herein.

149.    As direct result of Defendants' acts, omissions and practices in violation of the UTPCPL, Defendants have caused the Municipal Plaintiffs and its affected residents, together with Haverford Township and its residents, and other persons in interest to incur and continue to incur significant environmental, financial and health-related harms.

150.    As Defendants' foregoing acts and practices in violation of the UTPCPL were the substantial factor in the contamination as alleged herein, Defendants are responsible for restoring to the Municipal Plaintiffs and its affected residents, together with Haverford Township and its residents, and other persons in interest the enormous costs and expenses which such affected persons in interest have incurred and will incur in remediating the contamination and otherwise redressing the injuries they have suffered.

151.    The DA Plaintiff seeks all legal and equitable relief as allowed by law, including, *inter alia*, injunctive relief for Defendants' violations of the UTPCPL, as authorized under § 73-201-4. Specifically, the DA Plaintiff seeks an injunction requiring Defendants to cease all false or misleading promotional, marketing, and advertising activities regarding the use of chemicals containing PFAS, PFOS and PFOA, and to inform the medical community and the public of the true consequences resulting from the prior use of such contaminants.

152.    The DA Plaintiff has reason to believe, based on the facts alleged herein, that the Defendants' omissions, misrepresentations, and practices related to the marketing,

37

advertisement, promotion, and sale of the contaminants identified herein have violated, and may continue to violate, the UTPCPL, absent the grant of an injunction.

153.    Unless restrained by this Court, the Defendants will likely continue to engage in the methods, acts, or practices which have a likelihood to deceive, mislead and confuse the public with respect to the use of the contaminants identified herein, all in violation of the UTPCPL.

154.    These ongoing, and likely future violations by Defendants of the UTPCPL are contrary to the public interest, thereby necessitating an injunction to restrain and prevent further such misconduct by the Defendants.

155.    Pursuant to Section 4 of the UTPCPL, 73 P.S. § 201-4, and due to their respective violations of the UTPCPL set out in this Complaint, the Defendants should further be ordered and directed by the Court to restore to the Municipal Plaintiffs, Haverford Township, and other persons in interest in or doing business in the County, any moneys or property, real or personal, which Defendants may have acquired by means of their violations of the UTPCPL, and which the Municipal Plaintiffs and Haverford Township have been caused to expend or will be required to expend so as to remediate or otherwise address the contamination identified within this Complaint.

156.    The DA Plaintiff further seeks and by way of restoration and/or restitution an order directing Defendants to disgorge all monies acquired or retained by Defendants as a result of their violations of the UTPCPL as alleged herein.

157.    Section 8 of the UTPCPL, 73 P.S. § 201-8, also empowers the Court to impose a civil penalty not exceeding $1,000 for each willful violation of the statute and a penalty not exceeding $3,000 for each violation where the victim is sixty years of age or older.

158.    The DA Plaintiff is entitled to the Court's assessment against Defendants of an appropriate civil penalty for each violation of the UTPCPL by them.

159.     The monies demanded herein are in excess of $50,000, exclusive of interests and costs.

**PRAYER FOR RELIEF**

Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1. The Commonwealth of Pennsylvania, acting by and through the Delaware County District Attorney, respectfully requests that the Court award the following relief against Defendants, jointly and severally, as follows:

    a.  Enter an order enjoining Defendants from continuing to violate the UTPCPL now and in the future through their deceptive marketing, and directing that Defendants take affirmative steps to provide accurate information the public as to the nature and consequences of PFAS, PFOA and PFOS;

    b.  Enter an order requiring Defendants to restore to the Municipal Plaintiffs, Haverford Township and other affected persons-in-interest in or doing business in the County, any moneys or property, real or personal, which Defendants may have acquired by means of their violations of the UTPCPL, and which the County, Municipal Plaintiffs and Haverford Township have been caused to expend or will be required to expend so as to remediate or otherwise address the contamination identified within this Complaint.

    c.  Enter an order directing Defendants to disgorge all monies acquired or retained by Defendants as a result of their violations of the UTPCPL both within the County, and outside the County that had negative impacts within the County.

    d.  Enter an order awarding the Commonwealth civil penalties under 73 P.S. § 201-8 against Defendants in a sum not exceeding $1,000 for each violation of the

statute and not exceeding $3,000 for each violation where the victim is sixty years of age or older; and

    e.  Such other and further relief as the Court deems just and proper.

2.  Delaware County and Primos-Secane Westbrook Park Fire Company #5 of Upper Darby Pennsylvania, Inc. hereby seek the following:

    A.    Compensatory damages according to proof including, but not limited to:

        1. Costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of PFAS contamination on and within Municipal Plaintiffs' Properties;

        2. Costs and expenses related to the past, present, and future treatment and remediation of PFAS contamination of Municipal Plaintiffs' Properties;

        3. Costs and expenses associated with and related to the removal and disposal of the contamination; and

        4. Costs and expenses related to the past, present, and future installation and maintenance of monitoring mechanisms to assess and evaluate PFAS on and within Municipal Plaintiffs' Properties.

    B.    Diminished property value;

    C.    Consequential damages;

    D.    Punitive damages;

    E.    Costs, disbursements, and attorneys' fees of this lawsuit;

    F.    Pre-judgment and post-judgment interest; and

    G.    Any other and further relief as the Court deems just, proper, and equitable.

122271583-1

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all issues so triable.

Dated: May 17, 2021

Jerry R. DeSiderato (PA ID No. 201097)
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Telephone: (215) 575-7000
Fax: (215) 575-7200

Scott Summy* (TX Bar 19507500)
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 521-3605
Fax: (214) 520-1181
Cary McDougal* (TX Bar 13569600)
Carla Burke Pickrel* (TX Bar 24012490)
Cristina Sanchez* (TX Bar 24041856)
John Fiske* (CA Bar 24256)
*\* To be admitted pro hac vice*

**COSSICH, SUMICH, PARSIOLA
& TAYLOR, LLC**
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Telephone: (504) 394-9000
Fax: (504) 394-9110
Philip F. Cossich, Jr.* (LA Bar 1788)
Darren Sumich* (LA Bar 23321)
David A. Parsiola* (LA Bar 21005)
Brandon J. Taylor* (LA Bar 27662)
Christina Cossich* (LA Bar 32407)
Andrew J. Cvitanovic* (LA Bar 34500)
Luana N. Smith* (LA Bar 35534)
*\* To be admitted pro hac vice*

*Attorneys for Plaintiff*

41

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by: Jerry R. DeSiderato

Signature: /s/ Jerry Desn

Name: Jerry R. DeSiderato

Attorney No. (if applicable): 201097

Rev. 12/2017

**IN THE COURT OF COMMON PLEAS
OF DELAWARE COUNTY, PENNSYLVANIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, ACTING BY AND THROUGH DELAWARE COUNTY DISTRICT ATTORNEY JACK STOLLSTEIMER; DELAWARE COUNTY; and PRIMOS-SECANE-WESTBROOK PARK FIRE COMPANY #5 OF UPPER DARBY PENNSYLVANIA, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.); E. I. DUPONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; DUPONT DE NEMOURS, INC.; CORTEVA, INC.; CHEMGUARD, INC.; TYCO FIRE PRODUCTS LP (successor-in-interest to The Ansul Company); KIDDE-FENWAL, INC.; KIDDE PLC, INC.; CHUBB FIRE, LTD.; UTC FIRE & SECURITY AMERICAS CORPORATION, INC.; CARRIER GLOBAL CORPORATION; RAYTHEON TECHNOLOGIES CORPORATION (f/k/a United Technologies Corporation); NATIONAL FOAM, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; ARKEMA, INC.; BASF CORPORATION; CHEMDESIGN PRODUCTS, INC.; CLARIANT CORPORATION; CHEMICALS INCORPORATED; NATION FORD CHEMICAL COMPANY; AGC INC. (f/k/a Asahi Glass Co., Ltd.); AGC CHEMICALS AMERICAS INC.; DEEPWATER CHEMICALS, INC.; DYNAX CORPORATION; ARCHROMA MANAGEMENT, LLC; ARCHROMA U.S., INC.; AND JOHN DOE DEFENDANTS 1-49,<br><br>Defendants. | CIVIL ACTION<br>No.:<br><br><br>**List of Defendants and Addresses for COMPLAINT IN CIVIL ACTION** |

**LIST OF DEFENDANTS AND ADDRESSES**

3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.) ("3M")
3M Center
St. Paul, Minnesota 55144

E. I. DuPont De Nemours and Company ("DuPont")
974 Centre Road
Wilmington, Delaware 19805

The Chemours Company ("Chemours")
1007 Market Street
Wilmington, Delaware 19899

The Chemours Company FC, LLC ("Chemours FC")
1007 Market Street
Wilmington, Delaware, 19899

DuPont de Nemours, Inc.
974 Centre Road, Building 730
Wilmington, Delaware 19805

Corteva, Inc.
974 Centre Road
Wilmington, Delaware 19805

Chemguard, Inc. ("Chemguard")
One Stanton Street
Marinette, Wisconsin 54143

Tyco Fire Products LP ("Tyco")
1400 Pennbrook Parkway
Lansdale, Pennsylvania 19446

Kidde-Fenwal, Inc. ("Kidde")
One Financial Plaza
Hartford, Connecticut 06101

Kidde PLC, Inc.
9 Farm Springs Road
Farmington, Connecticut 06032

Chubb Fire, Ltd. ("Chubb")
Littleton Road, Ashford
Middlesex, United Kingdom TW15 1TZ

UTC Fire & Security Americas Corporation, Inc. ("UTC")
13995 Pasteur Blvd.
Palm Beach Gardens, Florida 33418

Carrier Global Corporation ("Carrier")
13995 Pasteur Boulevard
Palm Beach Gardens, Florida 33418

Raytheon Technologies Corporation (f/k/a United Technologies Corporation)
("Raytheon Tech f/k/a United Tech")
10 Farm Springs Road
Farmington, Connecticut 06032

National Foam, Inc. ("National Foam")
141 Junny Road
Angier, North Carolina 27501

Buckeye Fire Equipment Company ("Buckeye")
110 Kings Road
Mountain, North Carolina 28086

Arkema, Inc. ("Arkema")
900 1st Avenue
King of Prussia, Pennsylvania 19406

BASF Corporation ("BASF")
100 Park Avenue
Florham Park, New Jersey 07932

ChemDesign Products, Inc. ("ChemDesign")
2 Stanton Street
Marinette, Wisconsin 54143

Clariant Corporation ("Clariant")
4000 Monroe Road
Charlotte, North Carolina 28205

Chemicals Incorporated ("Chem Inc.")
12321 Hatcherville Road
Baytown, Texas 77521

Nation Ford Chemical Company ("Nation Ford")
2300 Banks Street
Fort Mill, South Carolina 29715

AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC")
1-5-1, Marunouchi, Chiyoda-ku
Tokyo 100-8405 Japan

AGC Chemicals Americas, Inc. ("AGC America")
55 E. Uwchlan Avenue, Suite 201
Exton, Pennsylvania 19341

Deepwater Chemicals, Inc. ("Deepwater")
196122 E County Road 40
Woodward, Oklahoma 73801

Dynax Corporation ("Dynax")
103 Fairview Park Drive
Elmsford, New York 10523

Archroma Management, LLC
Neuhofstrasse 11, 4153 Reinach,
Basel-Land, Switzerland

Archroma U.S., Inc.
5435 77 Center Dr., #10
Charlotte, North Carolina 28217

Defendants John Doe 1-49 - Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiff will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.